## CADLE v. UNITED STATES.

No. 1854.

District Court, N. D. California, N. D.

April 18, 1946.

Gladstein, Grossman, Sawyer & Edises, of San Francisco, Cal., for libelant.

Brobeck, Phleger & Harrison and R. L. Miller, all of San Francisco, Cal., for respondent.

WELSH, District Judge.

Libelant alleged in his complaint that he was a member of the crew of the S. S. Lur-

line, employed as such through the War Shipping Administration; that he left San Francisco on September 21, 1943, and that while the vessel was in the Indian Ocean on or about November 6, 1943, he became ill. He charged that respondent was negligent in that it supplied to him food unfit for human consumption.

A duodenal ulcer from which libelant suffers is alleged to be the direct and proximate result of the negligence of respondent in supplying unfit food.

Libelant testified on direct examination that hamburgers and steaks served to the crew were not sufficiently cooked; that rice contained weevils, oatmeal contained cockroaches, chicken and turkey were tainted and that broccoli was covered with some kind of bug or aphis.

However, on cross-examination he made such admissions as:

"Q. Did you eat the cockroaches that you found in the food? A. Naturally, no.

"Q. Did you eat the weevils that you found in the rice * * * before you got sick? A. No.

"Q. You didn't eat any of the cockroaches that you found in the other food, is that correct? A. I did not.

"Q. And when it (poultry) had an offensive taste you didn't eat it, is that correct? A. That is correct.

"Q. And any of the food that was served to you aboard the ship that had an offensive odor you didn't eat, is that correct? A. That is right.

Even on re-direct examination, he reiterated—"after I saw any aphis in the broccoli I didn't eat any broccoli. I didn't eat any rice pudding or the oatmeal when I detected cockroaches in it."

This leaves libelant's case practically devoid of any evidence in support of the allegations of negligence. He did state that he ate certain potatoes and hamburger when they did not taste exactly right. Nevertheless, it is difficult to see how that eating by him could be chargeable as negligence against respondent. If any culpability existed in that behalf it was solely that of libelant in not exercising due restraint of his appetite for his own physical well being.

Libelant's own testimony showed that respondent actually did serve unobjectionable foods, and a variety thereof, at each meal. Counsel for respondent introduced in evidence menus for various days of the week, upon examining which libelant stated that they fairly represented the food served on board the Lurline during the trip. These menus listed items such as prunes, pineapple juice, wheat-hearts, dry cereals, eggs, bacon, cinnamon rolls, Danish pastry and toast for breakfast; lettuce, soup, stew, lamb curry, meat balls and spaghetti, and vegetables for luncheon; and mixed fruit cocktail, sardines, mixed olives, soup, roast leg of spring lamb and roast beef for dinner. Libelant's testimony to the effect that practically all of the foods listed were available at the meals specified, and that none was objectionable except hamburger, potatoes, oatmeal and rice, was directly contrary to the allegations of his complaint.

Neither was other evidence introduced in his behalf persuasive. Earl Joseph Castro, although called by libelant, corroborated his testimony as to the variety of the foods available at mess.

Philip E. Bent gave testimony for libelant by deposition wherein he stated that there was nothing wrong with the cereals and the "bacon and eggs and ham and eggs were all right."

Executive Chef Paul Koy testified on behalf of respondent that all food taken on board had been inspected by government agencies on the dock and that he made inspections each time it was prepared to serve. He found no spoiled or unfit food being served on the trip. He recalled that the rice and oatmeal for the trip in question were ordered fresh because he had sold all the rice on hand when arriving at port from a previous voyage. He also remembered that the oatmeal was fresh because the contemplated trip was a long one and a larger supply of food was needed.

■ Libelant's claim to damages is grounded on negligence. It is fundamental that a seaman's right to recovery from an employer must be based on either negligence or unseaworthiness of a vessel or its appliances. Vojkovich v. Ursich, 49 Cal. App.2d 268, 271, 121 P.2d 803.

■ Libelant had the burden of establishing negligence by a preponderance of the evidence. Sandoval v. Fruit Express Co., 1944 A.M.C. 580, 583.

■ Even if libelant had established that food unfit for human consumption had been served, that would not necessarily constitute negligence. The law requires

that provisions furnished a crew shall be in sufficient amount and of suitable quality. The John L. Dimmick, 13 Fed.Cas. page 69 No. 7,355.

However, an owner is not liable for bad cooking where good food is provided. The Silver Shell, D.C., 255 F. 340, 341.

While the burden of proof is on the owner to show that a ship is properly provisioned (Miller v. Lykes Bros.-Ripley S. S. Co., 5 Cir., 98 F.2d 185, 186), a seaman who alleges that bad food caused his illness must meet the issue of causation. "As to this issue, the ordinary rules of evidence applied, and the proof to sustain recovery must be more than mere speculation or conjecture." Miller v. Lykes Bros.-Ripley S. S. Co., supra.

It was said in the adjudicated case: "The most that any of appellant's medical witnesses would say was that there was a possibility or strong likelihood that food poisoning could cause polycythemia. Appellant has not sustained the burden on this issue." So in the instant case, the proof offered on behalf of libelant went no further than to show a possibility or likelihood that a susceptibility to duodenal ulcer might have arisen from a nervous condition of libelant during the voyage.

The necessity for proving negligence was emphasized in Pittsburg S.S. Co. v. Palo, 6 Cir., 64 F.2d 198, 200, wherein it was said that a ship owner is not an insurer of the safety of a seaman; American Pacific Whaling Co. v. Kristensen, 9 Cir., 93 F.2d 17, 20, wherein the view was expressed that an employer is not liable for any defects or insufficiencies not attributable to negligence; and Brittingham v. Ore S.S. Corp., 4 Cir., 62 F.2d 616, wherein the Court pointed out that it had no authority to find against the owner of the ship in the absence of negligence.

In Goodrich v. United States, D.C., 5 F.Supp. 364, 365, it was said: "To recover in a case of this type, the libelant must be able to point to some negligence as a result of which the deceased contracted typhoid fever. The mere fact that he got the disease while on the respondent's ship is not enough." That language is stronger than need be used here, for there is no convincing proof that libelant actually developed a duodenal ulcer while in the employ of respondent.

If negligence of some sort on the part of respondent were conceded, still libelant failed to sustain the burden of proving proximate cause. This phase of his case rested almost entirely on the testimony of Dr. William J. Newman, a physician and surgeon engaged in general practice in Sonoma, California. Said doctor testified that he made an examination of libelant on the 20th day of August, 1943, which disclosed no symptoms of ulcer.

Such lack of disclosure can well be accounted for by the fact that libelant's history contained nothing to indicate any reason for the doctor to check for the possible presence of duodenal, or any, ulcer.

The doctor stated on cross-examination—"Ulcer is a condition that is not developed as much by physical examination as it is by a careful history."

The examination given libelant was thus described on direct examination: "He had no complaint at all at the time. Consequently a routine physical examination * * * was done and the findings were all normal * * * there was no indication for any further examination * * * I told him his general physical condition was normal."

It was not until December 7, 1943, that the witness again made an examination of libelant. Then, two months and two weeks after the first routine examination, libelant's family physician found that he had suffered from an ulcer. Said physician admitted that there are conditions of nervous or emotional upset which may cause or contribute to ulcer, regardless of diet.

Libelant failed to establish any causal connection between conditions under which he performed work for respondent and the development of ulcers. The situation is comparable to that in Tedesco v. Industrial Accident Commission, 86 Utah 501, 46 P.2d 670, 672, concerning which the Supreme Court of Utah said: "For applicant to establish a case it was necessary to show a causal connection between the alleged accident and the resulting injury, if any, and the duodenal ulcer, its perforation of the bowel, and the resulting peritonitis. The record fails to disclose any causal connection between the alleged accidental injury and the peritonitis causing death."

Medical testimony on behalf of respondent negatived the tainted food theory of libelant. Dr. Frederick N. Scatena, Chief of Medical Service at the Sacramento County Hospital since 1916, gave as his

opinion that a person could not live very long on tainted food. It is evident that, even if evidence of libelant had supported the allegations of his complaint with reference to food supplied to him being unfit for human consumption, that would not have established his theory that duodenal ulcers resulted therefrom.

Dr. Scatena's testimony was to the effect that duodenal ulcers cannot be always determined by a routine physical examination. He gave as his reasons that "an ulcer may be so placed in the stomach as to be in a silent area where no symptoms are evoked or the ulceration may be so small and minute as not to produce symptoms that are discernable by the patient."

Consequently, history of pain or other discomfort in the stomach might not be given to an examining physician. That may well account for Dr. Newman's not detecting ulcers when he examined libelant the first time on the 20th day of August, 1943. ·

Dr. Scatena's opinion that foods do not traumatize the mucus of the stomach sufficiently to produce an ulcer was supported by two reasons: "First, there must be a factor which could cause a loss of vitality of the small area of the mucosa of the stomach or the duodenum, and this in turn would cause breakdown of the tissue in that small area which would produce the ulcer. * * * Second, following that the gastric juice of the stomach, which contains hydrochloric acid and pepsin, working on this small area that had been initiated, would then excavate and cause an ulcer."

This medical expert stated that foods have the least effect on such process, and that they can be practically ruled out as a cause of ulcers.

Libelant's contention that food served aboard ship caused his ulcers is regarded as nothing more than speculative and conjectural.

This Court is convinced that libelant has failed in his proof in at least two respects —(1) no negligence of respondent was proven so far as serving of food was concerned, and (2) no causal connection was established between libelant's suffering with ulcers and any act or omission on the part of respondent.

Respondent will, therefore, have judgment for costs upon findings to be prepared by its counsel.