**LADJIMI v. PACIFIC FAR EAST LINE, Inc. et al.**

**No. 29578.**

United States District Court
N. D. California, S. D.

April 16, 1951.

Herbert Resner, Los Angeles, Cal., for plaintiff.

Dorr, Cooper & Hays, San Francisco, Cal., for defendant.

MURPHY, District Judge.

This is a civil action by a seaman to recover for physical injuries alleged to have been sustained in a shipboard fall, for subsequent improper medical care on the repatriating vessel, and for special damages in the nature of lost wages and maintenance money.

## Pleadings

The complaint sets out four causes of action. The first two are alternative claims for personal injury, the first under general maritime law for unseaworthiness, and the second under the Jones Act, 46 U.S.C.A. § 688. General damages in the amount of $50,000 are claimed. The third, for damages in the amount of $25,000, is predicated upon aggravation of the injury and illness occasioned by inadequate medical attention aboard the repatriating vessel. The fourth is for loss of wages since the end of the voyage, at the rate of $300 per month, and for past and prospective maintenance and cure at a stipulated rate of $6 per day.

Defendant denies liability as to the first three causes of action and pleads contributory negligence as an affirmative defense in mitigation of any damages arising from the fall. Payment is pleaded as a defense to the claim for maintenance and cure.

## Facts

The facts immediate to the injury are undisputed:

Some two months prior to the injury upon which this action is based and after the voyage had commenced, the Chief Engineer caused a two inch waste line, which conducted excess condensate from the auxiliary condenser into the bilge, to be removed. It was replaced by a four inch line which ended overhead rather than in the bilge. So constructed and maintained, it intermittently evacuated hot water and steam upon whomever was working in its vicinity. The engine room personnel, including plaintiff, complained bitterly but no repair was made.

At the time of the accident plaintiff was engaged in wiping down the rods on the auxiliary condenser. Without warning he was suddenly scalded with a discharge of hot water and steam from the overhead pipe. In attempting to escape the burning spray he slipped on the wet floor, falling heavily on his abdomen and left side.

He sustained superficial burns, cuts about the left eye and on the scalp.

From that time until hospitalized on December 16, 1949, he complained of pain in his back and abdomen, nausea, diarrhea, and difficulty in breathing. At the hospital he suffered from violent and persistent vomiting and intermittent diarrhea. He complained of pains in the upper left abdominal quadrant, in the left lumbar region, and he apparently had difficulty breathing and in sleeping except in an upright position.

He was discharged from the hospital on January 13, 1950 as cured, except for some diarrhea, but with the recommendation that he be examined by the company doctor in the states.

Aboard the repatriating vessel there was evidence that his vomiting and diarrhea increased. He was at first denied quarters in the ship's hospital although there were beds available. Plaintiff testifies that toilet facilities in the crew's quarters were inadequate and he had to go out on deck into the weather to vomit. The crew cabled the Union in San Francisco and they prevailed on the port captain for Pacific Far East Lines to instruct the captain to put plaintiff in the ship's hospital. The captain did so but immediately had the ship's carpenter place a hasp on the toilet door so that Ladjimi could not use it. Plaintiff asserts he had his choice between descending two decks to the crew's quarters to use the toilet facilities, or going out on deck to vomit over the side. At Okinawa plaintiff's condition was diagnosed as an acute cold and for the duration of the homeward voyage the bathroom door was unlocked, although it does not appear that plaintiff was kept in bed, provided any attendance or medication.

Plaintiff arrived stateside on February 7, 1950. Since that time he has not worked except for one month, November, when he served as a watchman on the docks. He was hospitalized for a week in April, his complaints being diagnosed as acute bronchitis, and through October outpatient records of the U. S. Marine Hospital evidence further treatment of this ailment.

Although he was subjected to numerous physical examinations during the year following the injury, none of them satisfactorily accounted for his recurrent symptoms until on February 15, 1951, Dr. Abowitz, a specialist in internal medicine diagnosed his ailment as "diaphragmatic hernia caused by his fall on December 10, 1949." The conclusion that the observed hiatus hernia resulted from the trauma was based on the following points:

1. That the fall was severe enough and adequate to cause such herniation.

2. That his symptoms and complaints date from that accident.

3. That his symptoms and complaints are typical of such a hernia.

4. That there were no symptoms and complaints of that nature prior to the accident.

Dr. Holman, the court appointed specialist, agreed with this diagnosis and states in regard to plaintiff's present complaints: "(W)e cannot disregard the probability that violent compression of the abdomen, such as he (Ladjimi) described, can account for the production of a hiatal hernia and the development of the symptoms that he presents. The prolonged vomiting that immediately followed the injury strongly suggests this probability."

Dr. De Silva, for the defendant, thought that the hernia pre-existed and merely became symptomatic for a short time after the fall. He admits that such a hernia may enlarge and may impel an ulcerated condition or a disturbance and inflammation of the esophagus.

As to a prognosis, both Dr. Abowitz and Dr. De Silva suggest that the chances are against a successful operative repair. The former recommended a conservative course of therapy for the patient over a one year period, during which time he would be continuously under the care of doctors. Dr. Abowitz did not believe the plaintiff can ever. return to sea, even if maximum improvement is obtained. He states in his deposition: "(E)ven if sur-

gical repair is undertaken and were successful—this man would thereafter have to for the rest of life—avoid any strenuous occupation because it might lead to a breakdown of the surgical repair." On the other hand, Dr. De Silva does not feel that Ladjimi is presently or prospectively incapacitated to perform his shipboard duties.

## Contentions

Plaintiff:

1. Contributory negligence is not available as a defense in mitigation of damages where the unseaworthiness of a vessel or her appliances have caused the injury.

2. Even if this action is considered as based on negligence alone the defense of contributory negligence is not available where plaintiff had no choice but to work in the dangerous place.

3. There was a negligent failure to provide plaintiff with proper medical care aboard the repatriating vessel and it was rendered unseaworthy in that respect.

4. Plaintiff is entitled to maintenance and cure.

Defendant:

1. Contributory negligence is a partial defense to an action predicated upon either negligence or unseaworthiness, and acts in mitigation of damages.

2. Upon the facts plaintiff was contributorily negligent in that he knew of the overhead pipe and therefore "should not have been startled into falling" when struck with the spray.

3. The master of the repatriating vessel acted reasonably in denying to plaintiff hospital and bathroom facilities in reliance upon the doctor's report and even if unreasonable, no causal connection was established between plaintiff's illness and the master's act.

4. Plaintiff has been paid all the maintenance and cure to which he is entitled.

## Discussion

■ Preliminary Note: Defendant does not, and under the evidence could not, deny that the overhead waste line, constructed and maintained under the direction of the ship's officers, constituted a continuing hazard to the safety of plaintiff seaman. His brief does not deny that such a defective appliance renders the ship unseaworthy and that the employer is liable both under general maritime law and the Jones Act to indemnify any seaman injured as a result thereof.

I. Does Contributory Negligence Act in Mitigation of Damages and, if so, is it a Partial Defense to this Action?

■ That the comparative negligence rule obtains both under the Jones Act and general maritime law is so well established as not to merit discussion. Socony-Vacuum Oil Co., Inc. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265. On the other hand, it is equally well established that assumption of risk is not a defense to a suit brought by a seaman for failure of the master to provide safe appliances or a safe place in which to work. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

■■ The facts of the immediate case show plaintiff present at a place where he was required to work, performing the duties he was required to do. That he knew of the hazard inherent in the defectively constructed and maintained waste line is not in itself evidence of contributory negligence, nor, although immaterial here, even assumption of risk. As stated in The Frank and Willie, D. C., 45 F. 494, 496: "(S)eamen * * * are bound to obedience, and have not a landsman's option to throw up work. Obedience to officers is the necessary law of the ship; disobedience is criminal; and seamen have the corresponding right to protection against needless exposure. They are not required to vindicate their right to security by refusal to work at the risk of being put in irons or going to jail." See also Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, at page 430, 59 S.Ct. 262, 83 L.Ed. 265.

■ Defendant offered no evidence from which the court might infer that plaintiff used other than the highest degree of care in attempting to escape the danger,

nor in what way any fault of his contributed to the injury.

The cases cited by defendant do not deal with the situation here presented, where the seaman had no choice other than to expose himself to the hazard created by the employer. In Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265, the court was dealing with the question whether assumption of risk is a defense where the subject seaman could have avoided use of the unsafe appliance by a free choice of the safe one. The court there held that such unreasonable choice would give rise to the defense of contributory negligence with resulting mitigation of damages. The decision clearly distinguishes the cases where no such defense could be raised, viz., those where the seaman had no free choice of a safe appliance or safe place to work.

Defenses are matters of substance and not of words, and it avails the defendant nothing to paste the label of contributory negligence upon facts which at the most would sustain an inference of assumption of risk. There being no evidence that the injury was caused by other than defendant's breach of duty, his liability for that injury may not be mitigated.

II. Was There a Negligent Failure to Provide Plaintiff with Proper Medical Care Aboard the Repatriating Vessel?

As stated in The Iroquois, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955, "The duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime nations." "The duty * * is one annexed by law * * *, and annexed as an inseparable incident without heed to any expression of the will of the contracting parties." Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 174, 77 L.Ed. 368. "This duty does not depend upon fault. It is no merely formal obligation and it admits of no merely perfunctory discharge. Its measure depends upon the circumstances of each case—the seriousness of the injury or illness and the availability of aid." De Zon

v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, at page 818, 87 L.Ed. 1065. "If the failure to give maintenance or cure has caused or aggravated an illness, the seaman has his right of action for the injury thus done to him; the recovery in such circumstances including not only necessary expenses, but also compensation for the hurt." Cortes v. Baltimore Insular Line, supra.

Against this legal background the facts evidencing a breach of duty by the master of the repatriating vessel stand out in ugly relief. That plaintiff initially was refused hospitalization and quartered with the "black gang", might more or less satisfactorily be explained away. It is not possible, however, to gloss over the captain's callousness once he became aware of Ladjimi's condition, the fact that a radiogram from his company in San Francisco was necessary before plaintiff was given access to the hospital ward, the fact that the toilet was bolted close so that this retching seaman could not use it, the fact that medical attention and attendance were not provided. Even if true, it would be no excuse that the seaman did not constantly importune aid once the master knew or should have known of his need. "The master was his (the seaman's) legal guardian in the sense that it is * * * his duty to look out for the safety and care of his seamen, whether they make a distinct request * * * or not". The Iroquois, supra. In one form or another, the idea has often been expressed that "the relationship of the ship owner to the seaman is more closely analogous to that of father and child than to that of an employer to a mere employee." See Jones v. Waterman S.S. Corp., 3 Cir., 155 F.2d 992, 1000. How oddly it sounds in the mouth of defendant then to say, as he does at page 26 of his brief, "If some of his shipmates were so solicitous of his well-being, why did they not do the things that the ship is now charged with not doing?—that is, take meals to him, empty his slop-bucket, etc."

The causal connection between neglect and illness is apparent. As Dr. Abowitz

stated: "I would regard such care as grossly inadequate and directly responsible for aggravating—aggravation of his condition, and the cause of the bronchitis, which he developed." Plaintiff was still suffering from the effects of the bronchitis as late as October, 1950.

III. For What Period of Time, if any, is Plaintiff Entitled to Maintenance and Cure?

There is no dispute between the parties as to the settled maritime law which provides that a seaman injured or taken sick in the service of his ship may recover that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future. Calmar SS Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. The only quarrel is as to what constitutes a reasonable time.

In view of the nature of the injury, the one year estimate of Dr. Abowitz, concurred in by the court appointed physician, does not seem excessive. It is stipulated that the maintenance should be paid at the rate of $6 daily.

IV. Computation of Damages:

A determination of liability having been made, it is the final duty of this court, as trier of fact, to measure that liability, money-wise, and assess damages. It is not an easy task nor an entirely rational one. In many instances the court must pretend to know the unknowable, for any appraisal of prospective detriment necessarily involves some speculation. There is no yardstick of unvarying units which may be applied to the fabric of facts. Each element of computation is as personal as the injury itself. Precedent lends no certainty. As Sutherland (Damages,) 4th ed., § 1256 states: "(T)he recovery allowed (for hernia) is based upon so many special factors that the verdicts are practically useless so far as furnishing precedent is concerned. The varying facts make it necessary that each case be a law unto itself." It is of no aid to this court to have counsel point out cases where $50,000 was awarded nor others meriting $500. The depreciated purchasing power of the dollar, without more, would make such decisions a suspect criterion. Thus, the judgment in this case must and does rest upon its individual facts, the money value of detriment suffered and that reasonably certain to be suffered in the future.

Plaintiff is fifty-one years old. His life expectancy is 22.4 years. He has sustained a permanent partial disability in the nature of a hiatus or diaphragmatic hernia. Prior to this injury he was in good health. For the past ten years he has made his living as a seaman. Before that time he was, among other things, a professional wrestler. He is uneducated and has difficulty expressing himself. The evidence and observation reveals neither aptitude, training, nor capacity (a gentle euphemism) for anything other than the physical labor of which this injury deprives him. A man of his age, mentality, and background is as surely, if not as obviously, incapacitated by this internal injury as if the muscles of his arms and back had wasted away. His sole "capital asset" has suffered a very real depreciation. Although it is not unlikely that he will, in time, find some sedentary employment, it is patent that the field of employment opportunities has been gravely narrowed for him. For prospective detriment the court awards plaintiff the sum of $15,000.

As an item of special damages plaintiff is entitled to recover his past wage loss at the rate of $300 per month. Thirteen months loss of wages amounts to $3,900 and with a $400 credit plaintiff is entitled $3,500.

For the pain, suffering and shock incident to the fall and its after effects plaintiff is awarded general damages in the amount of $3,000.

Indemnity for aggravation of plaintiff's injury and further illness caused by the employer's neglect aboard the repatriating vessel are assessed in the amount of $1,000.

Finally, maintenance and cure is due in the sum of $2,520.

Upon the above schedule of compensation it is hereby ordered that judgment be in favor of plaintiff and against defendant in the amount of $25,020.

Findings of fact and conclusions of law are to be prepared in accordance with the rule.